UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

CASH DEPOT, LTD d/b/a 1st ISO PROCESSING,

    Plaintiff,

v.                                            Case No. 15-C-1012

FIRST AMERICAN PAYMENT SYSTEMS, L.P.,

    Defendant.

## DECISION AND ORDER

This is a dispute between the Plaintiff and the Defendant over ATM processing fees allegedly owed by the Defendant under an agreement between the Defendant and a predecessor to the Plaintiff. On the same day it filed the complaint, the Plaintiff moved for "fast-track" summary judgment. This court denied the motion in a November 3, 2015 hearing. In that hearing, I indicated my view that the Defendant, rather than the Plaintiff (the moving party), had the better argument on interpreting the contracts at issue. Based on my statements during the hearing, the parties, in an apparent effort to save time and expense, then stipulated to entry of judgment in favor of the Defendant, the goal being a swift appeal on a discrete question of law. The Plaintiff did appeal, but the unusual footing of the case prompted the court of appeals to question the finality of the judgment this court had entered. In an attempt to properly achieve the requisite finality, both parties then filed motions in this court. The Plaintiff sought final partial judgment as to its own claims pursuant to Fed. R. Civ. P. 54(b), but that motion was denied. The Defendant then moved for summary judgment on the Plaintiff's claims. The court of appeals, citing that pending motion, ultimately

dismissed the appeal because this action remained open with a pending motion.

The Defendant's motion for summary judgment—essentially another effort to bring finality to this narrow dispute—is now presently before me. In 2003 the Defendant entered into a processing agreement with a company called Concord Processing, L.P., which later became known as First Data Retail ATM Services, L.P. Under that agreement, the Defendant agreed to a series of minimum monthly payments it would incur in the event the fees it otherwise paid did not reach that level. These minimum monthly fees ranged from $21,000 to $30,000, with fees of $25,000 being due in the fifth year of the agreement through the end of the agreement's "initial term," which was 66 months. (ECF No. 13-1 at 27.) Soon after, however, the parties signed a letter agreement indicating that the monthly minimum would be reduced to $15,000 for the remaining term of the agreement. (ECF No. 13-2.) In 2007, the parties agreed to a new amendment under which the minimum fee would begin at $10,000 and then gradually be phased down to $5,000 for the period between August 1, 2010 and February 28, 2011. (ECF No. 13-3 at 1.) In 2011, at the close of that agreement, the parties entered into a new agreement. One provision of that amendment provided as follows: "[T]he Fees and Service and the ATM Processing Services Schedules to the Agreement are hereby replaced and superseded by the Fee and Service and the ATM Processing Services Schedules attached hereto." (ECF No. 22-1 at ¶ 2.) The 2011 amendment contained no recitation of any minimum monthly fees.

In 2014 the Plaintiff acquired the rights to the agreement from First Data. In the months following Plaintiff's acquisition, Plaintiff received $21,266.58 in fees as a result of its relationship with the Defendant. Throughout their history, neither the Plaintiff nor its predecessors in interest charged a $25,000 minimum monthly fee, except for the first few months of the agreement in 2003.

In 2011 and after, Plaintiff's predecessor did not charge *any* minimum monthly fee, despite the fact that the monthly fees actually generated were usually less than $5,000. Plaintiff, after it acquired the contract, never charged a monthly fee at all. In May 2015, after the fees incurred by the Defendant had diminished to as little as a few cents per month, the Defendant sent Plaintiff a "Notice of Cancellation" indicating the Defendant's desire to cancel their agreement. Soon after, the Plaintiff reexamined the underlying agreements and then demanded from the Defendant back payments of the monthly $25,000 minimum payments as well as an early cancellation fee of $120,000. This lawsuit ensued when the Defendant refused to pay.

**I. Minimum Monthly Payments**

The Plaintiff argues that because the 2011 amendment was silent as to any minimum monthly fees, it did not supersede Section 2(d) of the original agreement, the clause that provided for a $25,000 minimum payment for the rest of the initial term. At a minimum, the Plaintiff argues, the operative minimum payment would be the $15,000 payments the parties agreed to when they amended that provision in July 2013. To recall, that agreement provided for a $15,000 minimum monthly fee for the duration of the initial term of the agreement, and since then the "initial term" has been extended by additional agreements reached in 2007 and 2011. Although the 2007 contract provided a schedule of minimum monthly payments (between $10,000 and $5,000) that clearly superseded the $15,000 payment agreed to in 2003, the 2011 contract was silent about any minimum monthly payments. In the Plaintiff's view, the 2011 amendment's silence on minimum payments indicates that the parties intended to default to their previous minimum payment provisions.

The Defendant responds that the 2011 amendment was not silent on minimum payments—it cancelled them. The contract indicates that "[T]he Fees and Service and the ATM Processing

3

Services Schedules to the Agreement are hereby replaced and superseded by the Fee and Service and the ATM Processing Services Schedules attached hereto." (ECF No. 22-1 at ¶ 2.) In the Defendant's view, this clause means that all fee provisions in previous agreements have been superseded by the 2011 amendment. Because that amendment is silent as to any minimum fees, this means there *are* no minimum fees. They point out that until the Defendant announced it was terminating their relationship, neither the Plaintiff nor its predecessor in interest ever tried to collect *any* minimum fee after the 2011 amendment was signed, much less a fee of $25,000 per month. Moreover, given the dwindling amounts of money being transacted, a minimum monthly payment of $25,000 (or even $15,000) would have made no commercial sense at the time the 2011 amendment was signed—at that point, the fee had been reduced to $5,000 during the last period governed by the previous agreement, and the parties were doing only a few thousand dollars of business every month. An outsized minimum fee of $25,000 simply would have made no sense. Finally, the Defendant cites contemporary communications between the parties to the negotiations that indicate they did not intend minimum monthly fees to be a part of the agreement after 2011.

I begin with the language of the 2011 agreement. The clause the Defendant cites indicates that "the Fees and Service and the ATM Processing Services Schedules to the Agreement are hereby replaced and superseded by the Fee and Service and the ATM Processing Services Schedules attached hereto." (ECF No. 22-1 at ¶ 2.) This clause clearly indicates that the fee *schedules* of the earlier agreements were to be superseded. The problem is that the minimum monthly fees the Plaintiff seeks to collect were not contained in any previous service or fee schedules; they are instead found in separate sections of the contracts under the subtitle "Minimum Monthly Fee." (ECF No. 13-3 at 1, ¶ 2(B).) Thus, even if the fee and service *schedules* were "replaced and

4

superseded" by those contained in the 2011 agreement, that does not necessarily mean the monthly minimum provisions were superseded.

However, it is evident from the absence of any mention of minimum monthly fees that the parties intended that no such fees would be due any longer. In fact, the context makes the omission of any monthly minimums glaring. That is, having included minimum monthly provisions in previous contracts, the parties' decision to omit any minimum monthly fees can only be viewed as an indication that they did not intend such fees to be part of their newest addendum. This is particularly true given the economics of the relationship and the fact that the then-existing minimum in 2011 was only $5,000. Had the parties intended to resurrect the old $25,000 (or $15,000) minimum from 2003, they surely would have done so explicitly.

At a minimum, however, the contract is ambiguous. The clause upon which the Defendant relies indicates, somewhat awkwardly, that "the Fees and Service and the ATM Processing Services Schedules to the Agreement are hereby replaced and superseded . . ." It is likely, given the context, that the parties intended "Fees and Service" to modify "Schedules," meaning that only the schedules were being superseded. However, the way it is worded would also allow one to conclude that the "Fees" themselves were being superseded—in other words, *any* fees due under the new agreement were limited to those in the newly created schedules. Because no minimum fees are set forth in those schedules (or anywhere else), no such fees are due. In addition, the contract's silence itself creates an ambiguity in this context. The Plaintiff believes it is clear on its face that the 2011 agreement, because it was silent on the question, intended to re-establish minimum fees that had applied eight years earlier. But that ignores the fact that the previous contract had reduced fees to only $5,000, and fees had dropped consistently since 2003, when the original fees had been

5

established. Moreover, the contracts agreed to in 2003 and 2007 had established that the minimum fee was to be set forth on a sliding scale that was linked to specific time periods, for example, $5,000 for the period between August 1, 2010 and February 28, 2011. (ECF No. 13-3 at 1.) There is no indication, particularly in the 2007 agreement, that the parties intended to establish a "default" fee that was much higher. In fact, by dropping the fee down to $5,000 for the final period under the 2007 agreement, that agreement strongly suggests that any higher fee had long since been abandoned. The point is that no one could read the agreements in context and come to the conclusion that the Plaintiff was clearly and unambiguously entitled to a monthly fee of $25,000 or $15,000 simply because the initial term of the original agreement had been extended.

The original agreement provides that Delaware law governs. Under Delaware law (which is hardly unique in this respect), ambiguity in contractual terms opens the door to the consideration of extrinsic evidence. "If the contract is ambiguous, a court will apply the parol evidence rule and consider all admissible evidence relating to the objective circumstances surrounding the creation of the contract. Such extrinsic evidence may include overt statements and acts of the parties, the business context, prior dealings between the parties, [and] business custom and usage in the industry. After examining the relevant extrinsic evidence, a court may conclude that, given the extrinsic evidence, only one meaning is objectively reasonable in the circumstances of [the] negotiation." *Salamone v. Gorman,* 106 A.3d 354, 374–75 (Del. 2014) (citations omitted). Here, the Defendant has cited the contemporary notes of the individuals who negotiated the 2011 instrument. In a handwritten mark-up, Karen Wiseman, a vice-president of the Defendant, asks her counterpart at First Data whether the agreement should specifically eliminate minimum monthly fees. (ECF No. 13-5.) In his response, First Data's negotiator Ike Lauer indicates that such a clause

6

Case 1:15-cv-01012-WCG   Filed 11/01/16   Page 6 of 11   Document 42

was not necessary because the "next section" (i.e., section 2 of the 2011 draft agreement) superseded and replaced any fees: "Since this amendment supersedes the previous amendment and minimums are replaced by the following section, there is no need to have minimum language added here. Also, if there would have been a minimum commitment, a Fee and Services Schedule would have been included." (ECF No. 13-6.) This establishes that, even if the language is ambiguous, the individuals who entered into the 2011 agreement did not believe any minimum fees would be due any longer.

More telling is the economic reality of the relationship. In 2011, at the time the new amendment was being negotiated, the monthly ATM fees generated ranged from $4,865 in January to a high of $5,660 in June. (ECF No. 13-7.) The Plaintiff has not even attempted to explain why parties generating about $5,000 of monthly business would have agreed to a monthly minimum fee of three or five *times* that amount. A minimum fee is designed to be a *floor* in the event sales drop below an expected amount, a kind of insurance policy for the provider to ensure some minimum amount of revenue. It is not designed to be a *multiplier* of the revenues the parties already generate. Given the smaller level of business the parties were conducting by 2011, it makes perfect sense that the parties would have agreed to eliminate the monthly minimum altogether.

Perhaps most salient is the fact that neither First Data, the Plaintiff's predecessor, nor the Plaintiff itself, ever attempted to collect a minimum monthly fee under the 2011 agreement. In business it is highly uncommon for a party to overlook hundreds of thousands of dollars in fees it is owed. Even more persuasive is the fact that First Data (and then the Plaintiff) actually billed the Defendant other amounts each month, all of which were well below the purported minimums. Had they believed the minimum fee applied, they would have billed that amount rather than an amount based on revenues generated. Thus not just two, but *three* parties (including the Plaintiff's

7

predecessor) behaved as though their agreement included no requirement of a monthly minimum fee. This course of dealing is perhaps the best indicator of the parties' true intent. For these reasons I conclude that the parties' most recent agreement eliminated any requirement that the Defendant must pay a minimum monthly fee.

## II. Early Termination

On May 29, 2015, the Defendant sent a termination letter to the Plaintiff. The letter read, in relevant part: "Please accept this letter as notice of termination as required under paragraph 17. Termination [sic], of the above referenced Agreement [ATM Agreement dated March 1, 2003, Amended August 1, 2007 and January 1, 2011]. We would also like to terminate processing on the AFFN and NYCE ATM Networks effective immediately." (ECF No. 13-8.) Paragraph 17 of the original agreement provided that "This Agreement may be terminated by either party at the end of the initial term or any subsequent term upon one hundred eighty days' prior written notice to the other party."

Upon receipt of the notice, the Plaintiff reviewed its agreements with the Defendant and concluded (as discussed above) that it had failed to charge the Defendant the $25,000 minimum monthly payment. It also concluded that an early termination fee was owed. It calculated that fee based on paragraph 3 of the 2011 addendum, which provides:

> In the event this Agreement is terminated prior to the end of its then-current term, then User agrees to pay an early termination fee . . . in an amount equal to the product of the User's average monthly . . . billings to User by [First Data] for the preceding twelve (12) months prior to termination times the number of months left in the then-current term times eighty percent (80%). Such Early Termination Fee shall be paid by the User no less than thirty (30) days prior to termination.

(ECF No. 13-4 at 1.)

8

The Plaintiff, having discovered what it viewed as a right to the $25,000 minimum monthly payments, used that figure to calculate an early termination fee of $120,000, which was $25,000 multiplied by the six months remaining in the term, multiplied by 80 percent. The Defendant believes that no fee is owed whatsoever. In its view, the Plaintiff has unilaterally determined that the Defendant was terminating the contract immediately, when in fact the Defendant was merely giving 180 days' notice of termination, as required by paragraph 17 of the original agreement.

Neither side appears to be correct. As the Plaintiff points out, the clause cited above "replaced and superceded" paragraph 17 of the original agreement. (*Id.*) Thus, even if that original paragraph required 180 days' notice, the 2011 addendum eliminated that requirement. Under the 2011 provision, the termination fee is triggered merely upon termination, regardless of whether or how much notice was provided. If it was the Defendant's intent to give notice of termination six months in advance, it should not have relied on a superseded clause from an old contract to make that point. Instead, the notice of termination would reasonably lead the recipient to believe that termination was to be effective as soon as possible. In addition, the next sentence of the termination letter is suggestive of immediacy: "We would *also* like to terminate processing on the AFFN and NYCE ATM Networks *effective immediately*." (ECF No. 13-8) (italics added).

Regardless of the parties' intent, the termination fee is triggered not by notice or intent but by actual "termination" of the agreement. The Plaintiff construed the termination as being effective at the end of June 2015, and there is no evidence that the Defendant continued receiving services under the agreement beyond that date. Thus, it appears the agreement did terminate in June 2015 and that an early termination fee is therefore owed, because the termination occurred "prior to the end of its then-current term." (ECF No. 13-4 at 1.) However, the Plaintiff's calculation of that fee

9

is off the mark. First, as discussed above, there is no minimum monthly payment, and so the Plaintiff's demand for a fee based on $25,000 per month cannot be correct. Second, even if there *were* a minimum monthly payment, the termination fee is to be calculated based on an average of "the User's average monthly . . . *billings*." (ECF No. 13-4 at 1.) The word "billings" means the amount the Plaintiff actually billed the Defendant, not some abstract figure that would be calculated at a later date. Here, if the Defendant's figures are correct, the average billings for the twelve months preceding (and including) June 2015 appears to be about $1,426. (ECF No. 13-7.) That figure multiplied by six (months remaining), and then by eighty percent, would mean the Defendant owes the Plaintiff around $6,800. Of course, that issue is not before me. The only issue before me is the Defendant's motion for summary judgment, in which it argues it owes *no* termination fee. Accordingly, its motion on that score will be denied.

Accordingly, the motion for summary judgment is **GRANTED** to the extent that the Plaintiff is not entitled to any minimum monthly payments; it is **DENIED** in part because I conclude the Defendant does owe an early termination fee. The judgment dated January 19, 2016 is **VACATED**. The clerk will place the case on the calendar for a telephonic status conference to discuss further scheduling needed to resolve both Plaintiff's claim and Defendant's counterclaims.

One further matter remains. Counsel for Plaintiff has filed a motion to withdraw on the ground that he has changed law firms and Plaintiff has failed to respond to his request for instructions on whether Plaintiff wishes him to continue to represent Plaintiff or remain with his previous firm. Counsel indicates he is unable to continue representation in any event without a new retainer agreement and the file. Counsel is directed to advise Plaintiff of this decision and the upcoming scheduling conference and to notify Plaintiff that its failure to either continue with

10

Counsel or retain new counsel will result in dismissal of Plaintiff's claim and potentially entry of judgment on Defendant's counterclaims. If Plaintiff does not respond to Counsel's requests for instructions by the time of the hearing to schedule further proceedings, his motion to withdraw will be granted.

**SO ORDERED** this 1st day of November, 2016.

/s William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court